**Jenner & Block LLP**
Amy Gallegos (Cal. Bar No. 211379)
Agallegos@jenner.com
Christopher S. Lindsay (Cal. Bar No. 280525)
Clindsay@jenner.com
Kathleen J. Covarrubias (Cal. Bar No. 288891)
Kcovarrubias@jenner.com
Mara Ludmer (Cal. Bar No. 307662)
Mludmer@jenner.com
633 West 5th Street, Suite 3600
Los Angeles, CA 90071
Telephone:   (213) 239-5100
Facsimile:    (213) 239-5199

**Asian Americans Advancing Justice**
Laboni Hoq (Cal. Bar No. 224140)
Lhoq@advancingjustice-la.org
Christopher Lapinig (Cal. Bar No. 802525)
Clapinig@advancingjustice-la.org
1145 Wilshire Blvd.
Los Angeles, CA 90017
Telephone: (213) 977-7500
Facsimile: (213) 977-7595

*Attorneys for Edelynne Bergado*

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDELYNNE BERGADO,<br><br>              Plaintiff,<br><br>       v.<br><br>MARLON VELONZA; NELLE-ANN VELONZA; ETTA'S INTERNATIONAL COSMETICS; JOSEPHINE CADAOAS; AND NELSON DOMINGUIANO ORQUEZA,<br><br>              Defendants. | Case No. 2:17-cv-09070-JVS-JC<br><br>**FIRST AMENDED COMPLAINT FOR HUMAN TRAFFICKING AND INVOLUNTARY SERVITUDE**<br><br>**DEMAND FOR JURY TRIAL** |

1

Plaintiff Edelynne Bergado ("Edelynne") brings this action against Marlon Velonza, Nelle-Ann Velonza, Etta's International Cosmetics, Josephine Cadaoas, and Nelson Dominguiano Orqueza, (collectively, "Defendants"), as follows:

## INTRODUCTION

1.      In 2014, Plaintiff Edelynne Bergado, a young single mother of two from a rural province in the Philippines, was lured to the United States by Marlon and Nelle-Ann Velonza with promises of a well-paying job and a green card. Instead, she was forced into involuntary servitude for almost three years. Edelynne worked over 14 hours a day, seven days a week, in the Velonzas' home. The Velonzas confiscated Edelynne's passport, severely restricted Edelynne's use of her cell phone, and withheld most of Edelynne's wages, allegedly for safekeeping. Edelynne was verbally abused and was not allowed to leave the Velonzas' apartment without supervision. The Velonzas told Edelynne that she would be imprisoned and would lose everything if she told anyone about her situation or tried to escape. Nelle-Ann Velonza's sister Josephine Cadaoas and brother Nelson Dominguiano Orqueza knew about Edelynne's enslavement but did nothing to help her. Indeed, they benefitted from her servitude.

2.      Edelynne was rescued by the police in January 2017. Edelynne brings this action to seek compensation for her trafficking, years of unpaid wages, and the physical and emotional trauma she suffers as a result of her experience.

## JURISTICTION AND VENUE

3.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (civil action arising under federal law); 18 U.S.C. § 1595 (Trafficking Victims Protection Reauthorization Act or "TVPRA"); 29 U.S.C. § 216(b) (Fair Labor Standards Act or "FLSA"); and 28 U.S.C. § 1367 (supplemental jurisdiction over related state law claims).

4.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because, upon information and belief, all Defendants reside in this district, and because a substantial portion of the events or omissions giving rise to this action occurred in this district.

# PARTIES

5.     Plaintiff Edelynne Bergado is a citizen of the Philippines who was kept against her will in the Velonzas' home in Los Angeles, California, from approximately April 2014 to January 2017. Edelynne currently lives in Los Angeles and is applying for a T-Visa.

6.     Upon information and belief, Defendant Marlon Velonza currently resides at 3064 Shasta Circle, Apt. 2, Los Angeles, California 90065, and resided at this address during the time of the events that give rise to this Complaint. Mr. Velonza was Edelynne's employer pursuant to both federal and California law during the time of the events that give rise to this Complaint.

7.     Upon information and belief, Nelle-Ann Velonza currently resides at 3064 Shasta Circle, Apt. 2, Los Angeles, California 90065, and resided at this address during the time of the events that give rise to this Complaint. Mrs. Velonza was Edelynne's employer pursuant to both federal and California law during the time of the events that give rise to this Complaint.

8.     Upon information and belief, Etta's International Cosmetics ("Etta's") is the "doing business as" or "d/b/a" name of a business owned by Mrs. Velonza that sells cosmetics and provides facials and skin-whitening treatments. Upon information and belief, at all relevant times Etta's principal place of business was at 3064 Shasta Circle, Apt. 2, Los Angeles, California 90065. Etta's was Edelynne's employer pursuant to both federal and California law during the time of the events that give rise to this Complaint. At times herein, Mr. Velonza, Mrs. Velonza, and Etta's will be referred to collectively as the "Velonza Defendants."

9.     Upon information and belief, Josephine Cadaoas, Mrs. Velonza's sister, is a dentist licensed with the state of California. Upon information and belief, Dr. Cadaoas resides at 1830 Maginn Drive, Glendale, California 91202 and resided at this address during the time of the events that give rise to this Complaint. Upon information and belief, Dr. Cadaoas's dental offices are located at 4448 Eagle Rock

FIRST AMENDED COMPLAINT

Blvd., Suite D, Los Angeles, California, and 711 Fair Oaks Avenue, South Pasadena, California. Dr. Cadaoas benefited from Edelynne's labor and knew or should have known the circumstances under which Edelynne labored.

10.     Upon information and belief, Nelson Dominguiano Orqueza, Mrs. Velonza's brother, resides at 3064 Shasta Circle, Los Angeles, California 90065, and resided at this address during the time of the events that give rise to this Complaint. Upon information and belief, Mr. Orqueza benefited from Edelynne's labor and knew or should have known the circumstances under which Edelynne labored.

## **FACTUAL ALLEGATIONS**

**A.     The Velonza Family Recruited Edelynne From A Poor, Rural Province To Work In Their Factory In The Philippines.**

11.     Edelynne was born and raised in the municipality of Bani in the rural Philippine province of Pangasinan. She is the eldest of nine children. Her family often went hungry because her father, a fisherman, did not make enough money to feed them.

12.     When Edelynne was about one, Edelynne's mother sent Edelynne to live with her grandmother. Edelynne's mother was about to have another child and believed it would be better for Edelynne if she lived with her grandmother. The grandmother lived about a twenty minute walk from Edelynne's mother. The grandmother's house consisted of one room which served as the kitchen, living room, and bedroom. The property had a well for water and no electricity. There was no bathroom, so Edelynne would use a bathroom at her aunt's house. Approximately five family members lived in the house.

13.     Edelynne began working when she was 10 years old, doing chores for her neighbors for money and helping her mother sell vegetables or fish to make ends meet. She and her mother would buy vegetables or fish at a market that was about a thirty-minute walk away from where Edelynne lived. They would then walk around with the vegetables and fish they purchased and try to resell them to others, including

FIRST AMENDED COMPLAINT

those planting rice in the fields. Edelynne dropped out of high school during her third year to help support her family.

14.     By April 2013, Edelynne was a 25-year old single mother, still living in Pangasinan, working various jobs to feed her two small daughters. Through a relative, she was offered a job working at a cosmetics factory in San Pedro, Laguna, which was owned by members of the Velonza family. Although the factory was over 150 miles away from her home in Pangasinan, Edelynne was desperate for a job that would allow her to support her children. So she left her daughters with her mother and stayed in the home of a Velonza family member, Melinda Velonza, in San Pedro, Laguna in order to work at the factory. In addition to working at the factory, she was also given the task of taking care of Melinda Velonza's elderly mother. The Velonzas paid her 3,000 Filipino pesos per month, which equates to about 59 U.S. dollars per month.

**B.     Edelynne Was Recruited Into Forced Labor In The United States.**

15.     In November 2013, after having been employed by the Velonzas in San Pedro, Laguna for several months, Edelynne was told to speak with Marlon Velonza, Melinda Velonza's brother, over Skype about a new job opportunity. Marlon Velonza lived in the United States with his wife, Nelle-Ann, and their two adult children. During their Skype conversation, Mr. Velonza told Edelynne that his mother (who Edelynne was caring for in San Pedro, Laguna, in addition to her factory job), was coming to visit him in California and he wanted Edelynne to come with her as a caregiver.

16.     Mr. Velonza told Edelynne that he would triple her salary—to 9,000 pesos per month (approximately 177 dollars)—if she agreed to come to California. He said he would provide half of her salary directly to Edelynne and the other half to her mother, who was caring for Edelynne's children. He also represented that he would help with Edelynne's children's college tuition if she agreed to come to the United States.

17.     Edelynne had reservations about the position, and did not accept right

away. About a month later, Mr. Velonza called again, this time with his wife, Nelle-Ann Velonza, also on the phone. Mr. and Mrs. Velonza again promised to triple Edelynne's salary if she came to the United States. They told Edelynne that there would be better opportunities for her in the United States, and that she would be able to help her family in the Philippines. They also promised to "fix" Edelynne's papers—*i.e.*, help her obtain a green card—if she ended up working for them in the United States for at least a year.

18. After Edelynne accepted the Velonza Defendants' offer, but before she left the Philippines, the Velonza Defendants required Edelynne to sign a written employment agreement. The agreement was drafted by the Velonza Defendants in English, which Edelynne does not read fluently. The agreement stated that Edelynne was to "accompany and to be a caregiver to Felisa Velonza from March 29, 2014 to September 29, 2014." The agreement stated that Edelynne would be paid $8.00 per hour for up to 8 hours per day, and $12.00 per hour for every hour of overtime. Edelynne was not certain what the conversion rate was between U.S. dollars and pesos, but she understood the U.S. dollar amount was far more than she was currently making. Based on these representations, Edelynne agreed to come to California.

19. The Velonzas obtained for Edelynne a six-month visa and the plane ticket necessary to travel to the United States.

20. On April 6, 2014, Edelynne arrived in Los Angeles with Mr. Velonza's mother. Mr. Velonza picked them up from the airport and took them directly to his home, a unit in a four-unit apartment building located at 3064 Shasta Circle in Los Angeles. Once there, Mr. Velonza confiscated Edelynne's passport. Mr. Velonza also informed Edelynne that the contract she signed was not what they would follow.

21. For the first month after she arrived in Los Angeles, Edelynne worked every day as a caretaker for Mr. Velonza's mother. Typically, Edelynne would start her work at 5:30 or 6:00 A.M. and finish sometime between 6:00 and 9:00 P.M. At night, she slept on the Velonzas' living room floor or on the couch. About four days

FIRST AMENDED COMPLAINT

1  a week she would sleep only four or five hours because she would be woken up by
2  others in the apartment.

3       22.    After a month, Mr. Velonza's mother returned to the Philippines.
4  Edelynne expected that she would return home as well—and she was looking forward
5  to going home, because she missed her children and felt lonely and isolated living
6  with the Velonzas in a strange country. She was also beginning to fear the Velonzas.

7       23.    However, the Velonzas told Edelynne that they were not sending her
8  back and that she would instead stay in the United States and continue to work for
9  them. The Velonzas also reiterated that they would "fix" Edelynne's papers if she
10  worked for them for a year. Edelynne wanted to return home, however, even if it
11  meant Mr. Velonza would not "fix" her papers. She was frightened by her situation
12  and scared of the Velonzas.

13  **C.    Edelynne's Life In Servitude.**

14       24.    After Mr. Velonza's mother left, Edelynne's situation worsened. Her day
15  began around 5:30 or 6:00 A.M. every morning, when she would prepare breakfast
16  for the Velonzas and their two adult children. After breakfast, Edelynne would wash
17  the dishes and clean the house. Sometimes she would be given additional tasks such
18  as washing the family's cars, caring for their dogs, or doing yardwork. At the end of
19  each day, Edelynne would prepare the family's dinner and clean up all of the dishes.
20  Additionally, Edelynne often cooked for Dr. Cadaoas's adult son, Mrs. Velonza's
21  brother Nelson Dominguiano Orqueza, and Mr. Orqueza's family, who all lived in the
22  same apartment complex as the Velonzas. However, Edelynne never received any
23  remuneration from them. Her workday typically did not end until 8:00 or 9:00 at night,
24  sometimes later. Edelynne continued to sleep on the Velonzas' living room floor or
25  on the couch, so it was difficult for her to get rest if others in the apartment were
26  awake. Additionally, the Velonzas would wake Edelynne about three times a week to
27  do additional chores, such as cook food during the night that the Velonzas could take
28  with them on a trip the following day.

FIRST AMENDED COMPLAINT

25.     In addition to housekeeping, Mrs. Velonza forced Edelynne to work at Etta's, the skin bleaching and facial business that she ran out of the Velonzas' apartment. Edelynne's duties included preparing for, and cleaning up after, Mrs. Velonza's appointments with clients, and preparing and packaging products ordered through Etta's online store. Edelynne was also responsible for making the so-called "skincare" products that Mrs. Velonza sold and used on her clients. At Mrs. Velonza's instruction, Edelynne made these products by mixing together household cleaning items like laundry detergent and hydrogen peroxide. Sometimes Mrs. Velonza would purchase other brands of skin products and instruct Edelynne to change the bottle and replace the label such that the product appeared to be manufactured by Etta's.

26.     Mrs. Velonza also used Edelynne as a guinea pig to test the skincare products she was making out of household cleansers before they were used on paying customers. Not surprisingly, the products caused Edelynne's skin to become red and irritated, and she experienced painful burning. When she complained, Mrs. Velonza told her that the burning was necessary to "fix" her skin. Edelynne continues to suffer from skin irritation to this day as a result of the testing.

27.     After about three months, Edelynne said she wanted to return home to the Philippines. Mr. Velonza told Edelynne that she would be "pathetic" if she returned because she would not be able to provide for her children. He also indicated that Edelynne did not have the proper papers and that, because she did not have the proper papers, she would be detained by the police, jailed, and then deported if she tried to leave, and that she would never be able to return to the United States again.

28.     The Velonzas treated Edelynne harshly. She was made to work seven days a week and was never allowed a day off, even when she was sick. She was yelled at or reprimanded almost daily. On at least one occasion, Mrs. Velonza called Edelynne "putang-ina-mo" (which translates as "your mother is a whore"). Other times, Mrs. Velonza scolded Edelynne and called her "stupid" and "lazy." The Velonzas sometimes accused Edelynne of stealing the Etta's skin products (even

though she had no place to hide them and nothing to do with them). They rarely allowed her to call her daughters, and in July 2014 they confiscated her cellphone, and only allowed her to use it at night, when they could monitor who she spoke to and what she said. Edelynne's use of her cellphone was further restricted because it was not connected to any cellular service, but when Edelynne had possession of her phone, she was able to connect it to the Velonzas' Wi-Fi network.

29.    The Velonzas also imposed strict rules on Edelynne that were designed to isolate Edelynne and prevent others from learning about the conditions under which Edelynne labored. For example, Edelynne was prohibited from speaking with anyone outside the Velonzas' house. She was instructed not to leave the apartment and was almost never permitted to go out by herself. The only place she was allowed to go was church, with Mr. and Mrs. Velonza. At church, Edelynne was not permitted to speak with anyone. If someone spoke to her, Mr. or Mrs. Velonza would respond on her behalf. Mr. Velonza also told Edelynne that she was never to disclose anything that was happening to her in the household.

30.    To ensure that Edelynne never left the house, the Velonzas installed a closed-circuit television ("CCTV") monitoring system in their apartments and used it to watch Edelynne when they were not home. They watched the CCTV feed on their cell phones, and could use their phones to speak to Edelynne through the CCTV system. If they saw her resting or taking a break when they were out of the house, they would yell at her to continue working.

31.    The Velonzas did not pay Edelynne the wages they had promised. During her first three months in the United States (April through June of 2014), the Velonzas paid Edelynne approximately $200. However, after that they refused to pay her at all. The $200 or so the Velonzas paid Edelynne is manifestly unreasonable compensation given the years of work she provided for them. Though they sent money to Edelynne's mother in the Philippines each month, they told Edelynne that they would hold onto her half of her salary because she had no need for the money. On information and

belief, Mr. Velonza kept a spreadsheet detailing the amounts Edelynne was owed, which he was supposedly holding for her.

32.     The Velonzas prevented Edelynne from obtaining medical treatment. In early 2015, one of the Velonzas' dogs bit Edelynne's hand, when she was interacting with the dog at the Velonzas' direction. The bite broke the skin on Edelynne's hand and caused it to bleed. Mr. and Mrs. Velonza would not permit Edelynne to see a doctor, and they told her that seeing a doctor could lead to her being caught by the police. Edelynne developed a fever and nosebleed that night, but she hid it from the Velonzas because she believed they would only get mad at her—and still would not permit her to see a doctor—if they found out.

33.     Near the end of 2016, the Velonzas forced Edelynne to eat leftover mung beans they knew or should have known were spoiled. After eating the spoiled beans, Edelynne developed vomiting, diarrhea, and cold sweats. The illness lasted for more than three days but Edelynne was not permitted to see a doctor and was forced to continue working despite her illness.

34.     In addition to the Velonzas, Edelynne also worked for Dr. Cadaoas, Mrs. Velonza's sister, to pay off a $2,800 debt she supposedly owed Dr. Cadaoas for dental work. In early 2015, Edelynne developed a painful toothache that persisted for many months. By November 2015, the pain was so intense that Edelynne was weak and could not stop crying. Edelynne developed a fever, began shaking, and eventually could not work. At that point, the Velonzas took Edelynne to Dr. Cadaoas, who performed an emergency root canal. Upon information and belief, the root canal was performed without generating any medical records, to prevent anyone from learning Edelynne's identity or about the conditions under which she was being kept. Edelynne continues to experience pain in her tooth to this day.

35.     Afterwards, Mrs. Velonza announced that Edelynne now owed Dr. Cadaoas $2,800 for the root canal. Of course, Edelynne had no money because at that point she had been working without pay for the Velonzas for nearly a year. Mrs.

Velonza told Edelynne that, to pay her debt, she would have to work for Dr. Cadaoas as well. In particular, Edelynne was assigned to clean up after Dr. Cadaoas's adult son, who lived with his uncle Mr. Orqueza in one of the other units at the Shasta Circle apartment building. Edelynne learned from Mrs. Velonza that Dr. Cadaoas was aware of the arrangement and on one occasion Dr. Cadaoas acknowledged the arrangement during a conversation with Edelynne. Neither the Velonzas nor Dr. Cadaoas identified an end-date at which time Edelynne's alleged debt would supposedly be paid off. In fact, Edelynne continued doing this task (along with all of her other work) until her escape in January 2017. On information and belief, Dr. Cadaoas was aware that Edelynne was being forced to work against her will.

36.    Edelynne also requested on at least ten separate occasions that Mr. Velonza return her passport, yet he refused to do so. Once, Mr. Velonza responded by getting very angry and accusing Edelynne of stealing inventory from the family business. Likewise, whenever she requested her wages the Velonzas refused to give them to her, claiming she did not need them.

**D.    Edelynne Was Rescued After Almost Three Years in Forced Servitude.**

37.    As the years passed, Edelynne became more and more desperate to leave the Velonzas' home. In October 2016, after being scolded by the Velonzas, Edelynne hid in the laundry room of the Shasta Circle apartment building. She planned to escape through the apartment gate when no one was watching. However, Mrs. Velonza's brother Mr. Orqueza, was standing at the gate. Edelynne told Mr. Orqueza, "I can't stand it here anymore." Mr. Orqueza told her, "You have to put up with it. You are fortunate that you are here." Edelynne felt scared and believed that she had no choice but to go back into the apartment.

38.    Then, in early 2017, Edelynne got into an argument with the Velonzas over their refusal to provide her wages, which ended with Mr. Velonza violently closing the kitchen gate and threatening Edelynne by saying, "You don't know how I am when I'm mad." Edelynne was very frightened and resolved to leave no matter

what. She asked for help from a Facebook friend, who, on information and belief, reported Edelynne's story to the National Human Trafficking Hotline.

39.     On January 12, 2017, police officers came to the Velonzas' home after receiving a 911 call reporting a kidnapping. The Velonzas were not there at the time. The police officers took Edelynne from the Velonzas' home.

40.     Edelynne still suffers daily from the trauma of her three years of forced servitude. Among other things, she has trouble sleeping and eating, suffers from headaches, back pain, and stomach pain, and is constantly anxious and fearful.

41.     Edelynne continues to live in fear of the Velonzas and their family. She is afraid that they will kill or hurt her for cooperating with the police, or that they will harm her family in the Philippines.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

Violation of the TVPRA; Involuntary Servitude

(Against the Velonza Defendants)

42.     Edelynne realleges and incorporates each of the foregoing paragraphs by reference.

43.     The Velonza Defendants knowingly and willfully held Edelynne in involuntary servitude, in violation of 18 U.S.C. § 1584(a).

44.     Edelynne brings this claim for relief pursuant to 18 U.S.C. § 1595, which provides a civil cause of action for victims of involuntary servitude.

45.     Under Section 1584(a), it is unlawful to "knowingly and willfully hold[] to involuntary servitude or sell[] into any condition of involuntary servitude, any other person for any term, or bring[] within the United States any person so held."

46.     The Velonza Defendants knowingly and willfully brought Edelynne to the United States used threats of arrest and deportation, and the withholding of Edelynne's wages and passport, to induce Edelynne to work more than 14 hours per day against her will without rest breaks or vacation, confining her to the Velonza

Defendants' home in a state of involuntary servitude. The Velonzas warned Edelynne not to talk to anyone about her predicament, denied her access to medical care, and only permitted her to leave the apartment when supervised. They repeatedly denied her requests to return to the Philippines, and installed a CCTV system to monitor her work while they were away. Due to her forced isolation, lack of formal education, and lack of legal sophistication, Edelynne was highly vulnerable to the Velonzas' threats and demands. These threats caused Edelynne to reasonably believe she had no choice but to continue her service to the Defendants. As a direct and proximate result of these actions, Edelynne worked for the Velonza Defendants as an involuntary servant and suffered damages, including emotional distress, economic losses, and physical injury. Edelynne is entitled to recover damages and reasonable attorneys' fees. Because of the intentional and outrageous nature of the Velonza Defendants' conduct, Edelynne also is entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION

TVPRA; Forced Labor

(Against All Defendants)

47.     Edelynne realleges and incorporates each of the foregoing paragraphs by reference.

48.     All Defendants knowingly obtained Edelynne's forced labor and services in violation of 18 U.S.C. § 1589.

49.     Edelynne brings this claim for relief pursuant to 18 U.S.C. § 1595, which provides a civil cause of action for victims of forced labor.

50.     Under Section § 1589, it is unlawful to knowingly provide[] or obtain[] the labor or services of a person by any one of, or by any combination of, the following means—(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or

pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

51.     All Defendants violated Section 1589 by threatening Edelynne, by knowingly "abus[ing] or threaten[ing] [to] abuse" "law [and] legal process," and by engaging in a "scheme, plan, or pattern intended to cause [Edelynne] to believe that, if [she] did not perform such labor or services, [she] . . . would suffer serious harm."

52.     The Velonza Defendants compelled Edelynne's forced labor by threatening that if she told anyone about her predicament or tried to escape, she would be arrested and jailed, and she would lose everything before being deported back to the Philippines.

53.     As a direct and proximate result of these actions, Edelynne was forced to continue laboring for the Defendants, and suffered damages, including emotional distress, economic losses, and physical injury. Edelynne is entitled to recover damages and reasonable attorneys' fees. Because of the intentional and outrageous nature of Dr. Cadaoas and the Velonza Defendants' conduct, Edelynne also is entitled to an award of punitive damages.

## THIRD CAUSE OF ACTION

### TVPRA; Trafficking into Servitude

### (Against the Velonza Defendants)

54.     Edelynne realleges and incorporates each of the foregoing paragraphs by reference.

55.     The Velonza Defendants engaged in trafficking Edelynne in violation of 18 U.S.C. § 1590.

56.     Edelynne brings this claim for relief pursuant to 18 U.S.C. § 1595, which provides a civil cause of action for victims of trafficking.

57.     Under Section 1590, it is unlawful to "knowingly recruit[], harbor[], transport[], provide[], or obtain[] by any means, any person for labor or services in

14

1   violation of [the TVPRA]."

2       58.    The Velonza Defendants engaged in the trafficking of Edelynne by:

3   obtaining her labor through false promises and deceptive conduct; arranging her

4   transportation to the United States through the procurement of a six-month travel visa

5   with which they had no intention to abide; holding her in the United States in

6   conditions of involuntary servitude and forced labor; and forcing her to provide labor

7   and services to others.

8       59.    As a direct and proximate result of these actions, Edelynne suffered

9   damages, including emotional distress, economic losses, and physical injury.

10  Edelynne is entitled to recover damages and reasonable attorneys' fees. Because of

11  the intentional and outrageous nature of the conduct, Edelynne also is entitled to an

12  award of punitive damages.

13                          **FOURTH CAUSE OF ACTION**

14                  TVPRA; Unlawful Conduct with Respect to Documents

15                          (Against the Velonza Defendants)

16      60.    Edelynne realleges and incorporates each of the foregoing paragraphs by

17  reference.

18      61.    The Velonza Defendants knowingly concealed, confiscated, and

19  possessed Edelynne's passport, in violation of 18 U.S.C. § 1592.

20      62.    Edelynne brings this claim for relief pursuant to 18 U.S.C. § 1595, which

21  provides a civil cause of action for unlawful conduct with respect to certain

22  documents.

23      63.    Under Section 1592, it is unlawful to "knowingly destroy[], conceal[],

24  remove[], confiscate[], or possess[]" a "passport," "immigration document," or other

25  "government identification document, of another person" in order "to prevent or

26  restrict or to attempt to prevent or restrict, without lawful authority, the person's

27  liberty to move or travel, in order to maintain the labor or services of that person."

28      64.    The Velonza Defendants knowingly concealed, removed, confiscated,

and possessed Edelynne's passport in the course of trafficking Edelynne, holding her in involuntary servitude, and subjecting her to forced labor in violation of the TVPRA. Edelynne is informed and believes, and on that basis alleges, that the Velonza Defendants took and retained her passport for the purpose of preventing or restricting her liberty to move or travel, and in order maintain her labor and services.

65.    As a direct and proximate result of the Velonza Defendants' actions, Edelynne has suffered damages, including emotional distress, economic losses, and physical injury. Edelynne is entitled to recover damages and reasonable attorneys' fees. Because of the intentional and outrageous nature of the Velonza Defendants' conduct, Edelynne also is entitled to an award of punitive damages.

### FIFTH CAUSE OF ACTION

TVPRA; Peonage

(Against the Velonza Defendants and Dr. Cadaoas)

66.    Edelynne realleges and incorporates each of the foregoing paragraphs by reference.

67.    The Velonza Defendants and Dr. Cadaoas held Edelynne "to a condition of peonage" in violation of 18 U.S.C. § 1581.

68.    Edelynne brings this claim for relief pursuant to 18 U.S.C. § 1595, which provides a civil cause of action for victims of peonage.

69.    Under Section 1581, it is unlawful to "hold[] or return[] any person to a condition of peonage."

70.    The Velonza Defendants and Dr. Cadaoas held Edelynne to a condition of peonage—or compulsory service—based upon Edelynne's alleged indebtedness to Dr. Cadaoas for dental services. The Velonza Defendants and Dr. Cadaoas used threats of arrest and deportation, physical isolation, and oppressive conditions to compel Edelynne's continued service and hold her to a condition of peonage.

71.    Edelynne has suffered damages, including emotional distress, economic losses, and physical injury. Edelynne is entitled to recover damages and reasonable

attorneys' fees. Because of the intentional and outrageous nature of Dr. Cadaoas and the Velonza Defendants' conduct, Edelynne also is entitled to an award of punitive damages.

<div align="center">

**SIXTH CAUSE OF ACTION**

Violation of the TVPRA; Knowingly Benefiting from a TVPRA Violation

(Against All Defendants)

</div>

72.     Edelynne realleges and incorporates each of the foregoing paragraphs by reference.

73.     Edelynne brings this claim for relief pursuant to 18 U.S.C. § 1595, which provides a civil cause of action for victims of violations of the TVPRA against "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of [the TVPRA]."

74.     All Defendants knowingly benefited from participation in a venture which they knew or should have known violated the TVPRA.

75.     Specifically, Edelynne was forced to cook meals for the Mr. Orqueza's family and clean the bedroom of Mrs. Cadaoas' adult son who lived with Mr. Orqueza's family. Further, in October 2016, Mr. Orqueza pressured her to stay in the Velonzas' home.

76.     Edelynne has suffered damages, including emotional distress, economic losses, and physical injury. Edelynne is entitled to recover damages and reasonable attorneys' fees. Because of the intentional and outrageous nature of the venture, and because of the intentional and outrageous nature of the Defendants' decision to knowingly accept benefits from this venture, Edelynne also is entitled to an award of punitive damages.

<div align="center">

FIRST AMENDED COMPLAINT

</div>

# SEVENTH CAUSE OF ACTION

## Violation of RICO

### (Against the Velonza Defendants)

77.     Edelynne realleges and incorporates each of the foregoing paragraphs by reference.

78.     The Racketeer Influenced and Corrupt Organizations Act ("RICO") makes it unlawful for any person associated with an enterprise to conduct or participate in the conduct of the enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. 18 U.S.C. § 1962(c). An "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity. 18 U.S.C. § 1961(4). Demonstrating a "pattern of racketeering activity" requires at least two acts of racketeering activity that amount to or pose a threat of continued criminal activity. 18 U.S.C.§ 1961(5). Predicate acts include, but are not limited to activities relating to peonage, slavery, and trafficking of persons. 18 U.S.C. §§ 1581–1592.

79.     The Velonza Defendants have violated 18 U.S.C. § 1962(c) because they are associated with an enterprise engaged in or whose activities affect interstate commerce, and have conducted or participated, directly or indirectly, in the conduct of the enterprise through a pattern of racketeering activity over the course of at least three years.

80.     The Velonza Defendants conducted and participated in an enterprise through a pattern of willfully, knowingly, and intentionally committing and/or conspiring to commit multiple or continuous predicate racketeering acts of peonage, slavery, and trafficking as explained in the forgoing paragraphs.

81.     These RICO predicate acts occurred over a substantial period of three years.

82.     These RICO predicate acts also threatened continuing harm or activity because the Velonza Defendants engaged in racketeering activity as a regular course

of business.  Also, but for the intervening acts of Edelynne's escape, the Velonza Defendants' racketeering activity would have continued.

83.    The Velonza Defendants have also violated 18 U.S.C. § 1962(d), for conspiring to violate 18 U.S.C. § 1962(c) by knowingly agreeing to facilitate a scheme which includes the operation or management of the RICO Enterprise.

84.    The racketeering activity caused Edelynne to suffer damages, including emotional distress, economic losses, and physical injury.

85.    Edelynne is entitled to recover treble damages and reasonable attorneys' fees.

## EIGHTH CAUSE OF ACTION

### California Trafficking Victims Protection Act

### (Against the Velonza Defendants)

86.    Edelynne realleges and incorporates each of the foregoing paragraphs by reference.

87.    California Civil Code § 52.5 allows a victim of human trafficking, as defined in California Penal Code § 236.1, to bring a civil action against any person who violates or deprives the victim of his or her personal liberty with the intent to obtain forced labor or services, or who restricts the victim's liberty through fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury. Forced labor or services means labor or services that are performed or provided by a person, and are obtained or maintained through force, fraud, or coercion, or equivalent conduct that would reasonably overbear the will of the person.

88.    The Velonza Defendants used threats, intimidation, fraud, deceit, and coercion to overbear Edelynne's will and to deprive her of liberty by forcing her to work long hours in poor conditions for minimal wages.

89.    Through such actions, the Velonza Defendants acted with malice, oppression, fraud and duress, and subjected Edelynne to a situation of human

1  trafficking. On information and belief, the Velonza Defendants conspired with each
2  other to violate California Civil Code § 52.5.

3       90.    Edelynne has suffered damages, including emotional distress, economic
4  losses, and physical injury. Edelynne is entitled to recover damages and reasonable
5  attorneys' fees. Because of the intentional and outrageous nature of the Velonza
6  Defendants' conduct, Edelynne also is entitled to an award of punitive damages. The
7  Velonza Defendants are also liable to Edelynne for treble damages under California
8  Civil Code § 52.5(b).

9  <center>**NINTH CAUSE OF ACTION**</center>

10 <center>Unfair Immigration-Related Practices</center>

11 <center>(Against the Velonza Defendants)</center>

12      91.    Edelynne realleges and incorporates each of the foregoing paragraphs by
13 reference.

14      92.    California Labor Code § 1019 prohibits an employer from engaging in
15 unfair immigration-related practices in response to protected conduct. Protected
16 conduct includes seeking information regarding whether an employer is in compliance
17 with the California Labor Code and informing any person of an employer's alleged
18 violation of the Code. Unfair immigration-related practices includes contacting or
19 threatening to contact immigration authorities.

20      93.    Edelynne is informed and believes, and on that basis alleges, that the
21 Velonza Defendants were aware of Edelynne's attempts to contact others about her
22 working conditions and for that reason retaliated against her. The Velonza Defendants
23 confiscated Edelynne's cell phone, restricted her use of social media, and further
24 restricted her ability to communicate with others. The Velonza Defendants also
25 threatened Edelynne with arrest and deportation. In so doing, the Velonza Defendants
26 engaged in unfair immigration-related practices.

27      94.    Edelynne has suffered damages, including emotional distress, economic
28 losses, and physical injury. Edelynne is entitled to recover damages and reasonable

<center>20</center>

attorneys' fees.

## TENTH CAUSE OF ACTION

### Breach of Contract

### (Against the Velonza Defendants)

95.     Edelynne realleges and incorporates each of the foregoing paragraphs by reference.

96.      At all relevant times, a contract existed between Edelynne and the Velonza Defendants that was oral, written, and/or implied. The terms of the contract or contracts upon which Edelynne relied included the implied agreement that she would be paid wages and provided other wage and hour benefits in accordance with all applicable federal and California laws, rules, and regulations.

97.     The Velonza Defendants knowingly and willfully breached their contract or contracts with Edelynne by failing to compensate Edelynne for her services according to the terms agreed to by the parties, and by substantially changing the agreed-to nature and scope of Edelynne's employment. Additionally, they breached the implied agreement that she would be provided wage and hour benefits that did not violate federal or California law. The Velonza Defendants also breached the contract or contracts' implied covenant of good faith and fair dealing through fraud, concealment, and misrepresentations, as set forth in the forgoing paragraphs.

98.     As a proximate result of the Velonza Defendants' breach, Edelynne sustained damages, including lost wages. She also experienced pain and suffering, including emotional distress, embarrassment, and humiliation.

99.     Because of the intentional and outrageous nature of the Velonza Defendants' conduct, Edelynne also is entitled to an award of punitive damages in an amount to be determined at trial.

FIRST AMENDED COMPLAINT

**ELEVENTH CAUSE OF ACTION**

Fraud and Negligent Misrepresentation

(Against the Velonza Defendants)

100.   Edelynne realleges and incorporates each of the foregoing paragraphs by reference.

101.   Defendants, directly or through their agents, knowingly and negligently made misrepresentations of, and failed to disclose, material facts regarding Edelynne's employment. These included, but were not limited to, misrepresentations of, and omissions regarding, the nature of the work required and the amount of money Edelynne would be paid.

102.   When the Velonza Defendants made these representations, they either knew the representations were false, made the representations recklessly with no regard for their truth, or had no reasonable grounds for thinking that the representations were true. Edelynne is informed and believes, and on that basis alleges, the Velonza Defendants made the representations with the intent to induce Edelynne to come to the United States and later to induce her to remain in the United States. At the time Edelynne acted, Edelynne did not know that the representations were false and believed them to be true. Edelynne considered the representations material and reasonably and substantially relied upon the representations to leave her home in the Philippines and later to remain in the United States.

103.   The Velonza Defendants had, and continue to have, both access to and actual possession of superior knowledge and special information with regard to facts relevant to a determination of Edelynne's rights as an employee in California. This superior knowledge and information includes, but is not limited to, knowledge of legal requirements for employers and amounts established by California law, such as the minimum wage. As a result of the Velonza Defendants' access to superior knowledge and their actual possession of such knowledge, the Velonza Defendants gained an unconscionable advantage and exerted undue influence over Edelynne, who was

1  ignorant of facts relevant to her employment status and rights and who was not in a

2  position to become informed of such facts.

3      104.   Despite the Velonza Defendants' superior knowledge and information,

4  the Velonza Defendants intentionally concealed from Edelynne that she was entitled

5  to minimum wage, overtime compensation, and other legal protections and benefits

6  available to employees under federal and California law, and misled her to believe the

7  opposite.

8      105.   As a proximate result of the Velonza Defendants' actions, Edelynne

9  sustained damages, including lost wages. She also experienced pain and suffering,

10  including emotional distress, embarrassment, and humiliation.

11      106.   Because of the intentional and outrageous nature of the Velonza

12  Defendants' conduct, Edelynne also is entitled to an award of punitive damages in an

13  amount to be determined at trial.

**TWELFTH CAUSE OF ACTION**

FLSA; Minimum Wage

(Against the Velonza Defendants)

17      107.   Edelynne realleges and incorporates each of the foregoing paragraphs by

18  reference.

19      108.   Under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq.,

20  live-in domestic workers must be paid the federal minimum wage. 29 U.S.C. § 206(f);

21  29 C.F.R. § 552.102.

22      109.   The federal minimum wage for all relevant times was $7.25 per hour. 28

23  U.S.C. § 206.

24      110.   The Velonza Defendants were Edelynne's employers within the meaning

25  of the FLSA, 29 U.S.C. §§ 203(d)-(e). The Velonza Defendants knowingly required

26  or permitted Edelynne to work 14 or more hours a day, seven days a week, and

27  knowingly and willfully refused to pay Edelynne the minimum wage required by the

28  FLSA for these hours worked, in violation of 29 U.S.C. § 206(f) and 29 C.F.R.

§ 552.102.

111.   The Velonza Defendants knew, should have known, or showed reckless disregard for the FLSA minimum wage provisions applicable to Edelynne and willfully, intentionally, and without good faith violated these laws.

112.   As a result of the Velonza Defendants' willful violations of the FLSA, under 29 U.S.C. § 216(b), Edelynne is entitled to recover from the Velonza Defendants her unpaid minimum wages in an amount to be determined at trial, plus an additional equal amount in the form of liquidated damages, as well as reasonable attorneys' fees and costs of the action, including pre- and post-judgment interest.

## THIRTEENTH CAUSE OF ACTION

California Labor Code; Minimum Wage

(Against the Velonza Defendants)

113.   Edelynne realleges and incorporates each of the foregoing paragraphs by reference.

114.   California Labor Code § 1197 establishes the right of employees to be paid minimum wages for their work, in amounts set by state law. For the time period between April 6, 2014 and June 30, 2014 inclusive, the minimum wage in California was $8.00 per hour. For the time period between July 1, 2014 and December 30, 2015 inclusive, the minimum wage in California was $9.00 per hour. For the time period between January 1, 2016 and January 12, 2017 inclusive, the minimum wage in California was $10.00 per hour. California Labor Code § 1182.12.

115.   From approximately April 6, 2014 until approximately January 12, 2017, the Velonza Defendants' employed Edelynne, paying her significantly less than the California State minimum wage for the hours that she worked.

116.   Under California's wage and hour laws, both the entity that officially employs a worker and any party that controls the employment relationship (including the owner of a business that directly or indirectly employs or exercises control over the wages, hours, or working conditions of a worker) is considered an "employer."

117.   Mr. and Mrs. Velonza employed Edelynne to work in their home and exercised personal control over the wages and hours of Edelynne.

118.   Mrs. Velonza also employed Edelynne to work for Etta's International Cosmetics, a business operated out of the Velonzas' home. On information and belief, Mrs. Velonza was at all relevant times the owner-operator of Etta's International Cosmetics and exercised personal control over the wages and hours of Edelynne.

119.   The Velonza Defendants were aware of, or should have been aware of, the requirement to pay Edelynne the statutorily defined minimum wage for their labor and their failure to pay the minimum wage was willful.

120.   As a direct and proximate result of these actions, Edelynne has sustained damages, including lost wages, entitling them to damages in an amount to be proven at trial and reasonable attorney's fees, and all appropriate penalties provided by the Labor Code, including liquidated damages. California Labor Code § 1194.

## FOURTEENTH CAUSE OF ACTION

California Labor Code; Overtime

(Against the Velonza Defendants)

121.   Edelynne realleges and incorporates each of the foregoing paragraphs by reference.

122.   California Labor Code § 510(a) and California IWC Wage Order No. 5 entitle "public-housekeeping" employees to one-and-a-half times their regular wage rate for hours worked in excess of eight hours per day (or forty hours per week) and twice their regular rate for hours worked in excess of twelve hours per day or in excess of eight hours per day on the seventh day of a workweek.

123.   Labor Code § 1198 and IWC Wage Order No. 15 provide for overtime payments to domestic service "live-in" employees in California who are not "personal attendants." Employees, like Edelynne, who spend more than 20 percent of their time engaged in activities other than taking care of a child or person requiring supervision, are not personal attendants. IWC Wage Order No. 15 provides that such workers shall

not be employed more than nine hours in any workday for the first five workdays in a work week unless they receive additional compensation beyond their regular wages in amounts specified by law. Such an employee is entitled to overtime pay at a rate of one and one-half times her regular rate for all hours worked in excess of nine during the first five workdays. For the first nine hours worked on the sixth and seventh days of the work week, the employee is entitled to be paid one and one-half times her regular rate. For the remaining hours worked on the sixth and seventh days, the employee is entitled to be paid at double her regular rate.

124.   Labor Code § 1194(a) provides that an employee who has not been paid the legal overtime pay may recover from his employer the unpaid balance.

125.   Mr. and Mrs. Velonza employed Edelynne to work in their home and exercised personal control over the wages and hours of Edelynne.

126.   From approximately April 6, 2014 to approximately January 12, 2017, Defendants failed to pay Edelynne the significant overtime wages she was entitled to under Labor Code § 510(a) and § 1198, as well as IWC Wage Order Nos. 5 and 15.

127.   The Velonza Defendants were aware of, or should have been aware of, the requirement to pay Edelynne the statutorily defined overtime pay for her labor and their failure to pay the overtime wage was willful.

128.   As a direct and proximate result of these actions, Edelynne has sustained damages, including lost wages, entitling her to damages in an amount to be proven at trial and reasonable attorney's fees, and all appropriate penalties and interest provided under California law.

### FIFTEENTH CAUSE OF ACTION

<div align="center">California Labor Code; Meal and Rest Periods</div>

<div align="center">(Against the Velonza Defendants)</div>

129.   Edelynne realleges and incorporates each of the foregoing paragraphs by reference.

130.   California Labor Code § 226.7 and applicable IWC Wage Orders require

employers to permit their employees to take specified, paid rest breaks and unpaid meal periods. Courts have recognized the right of employees to sue their employer for violations of § 226.7, characterizing § 226.7 claims as a kind of wage claim.

131.   The Velonza Defendants routinely and repeatedly failed to provide Edelynne with all legally required meal and rest periods, in violation of California Labor Code § 226.7 and applicable IWC Wage Orders.

132.   Due to the Velonza Defendants' unlawful failure to provide Edelynne with the meal and rest periods to which she was entitled by law, the Velonza Defendants are liable to Edelynne for statutory damages as provided by law. California Labor Code § 226.7.

## SIXTEENTH CAUSE OF ACTION

### California Labor Code; Wage Statements

### (Against the Velonza Defendants)

133.   Edelynne realleges and incorporates each of the foregoing paragraphs by reference.

134.   Under California Labor Code § 226, for each pay period, employers must furnish each employee with an accurate itemized statement reflecting employment information including gross wages earned, total hours worked, and itemized deductions. Employers must record wage deductions in ink and keep these records on file for at least three years.

135.   The Velonza Defendants knowingly and intentionally failed to provide Edelynne with accurate itemized statements in the form and manner specified by Labor Code § 226.

136.   As a direct and proximate result of these actions, Edelynne has sustained damages, including lost wages. In addition, under Labor Code § 226(e), Edelynne is entitled to recover $50 for the first violation and $100 for each subsequent violation, not to exceed $4,000. Under Labor Code § 226(e), Edelynne also is entitled to recover costs and reasonable attorney's fees.

**SEVENTEENTH CAUSE OF ACTION**

California Labor Code; Waiting Time Penalties

(Against the Velonza Defendants)

137.   Edelynne realleges and incorporates each of the foregoing paragraphs by reference.

138.   California Labor Code § 203 provides that if an employer willfully fails to pay any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the date of the termination of employment until the wages are paid, for up to thirty days.

139.   From the time of Edelynne's arrival on approximately April 6, 2014 to at least January 12, 2017, the Velonza Defendants refused and failed to pay Edelynne the minimum wages and overtime compensation required by law as set forth in the Labor Code and in the applicable IWC Wage Orders. The Velonza Defendants also refused and failed to provide Edelynne with statutory compensation for missed meal and rest periods as required by the Labor Code and the applicable IWC Wage Orders.

140.   The Velonza Defendants did not pay Edelynne all wages owed to her at the time her employment was terminated, thereby entitling Edelynne to recover waiting time penalties equal to thirty days' pay pursuant to Labor Code § 203.

141.   By virtue of the Velonza Defendants' unlawful failure and refusal to pay Edelynne's wages when due as required by law, the Velonza Defendants are liable to Edelynne in amounts to be proven at trial, and Edelynne is entitled to all appropriate penalties provided by the Labor Code and the relevant IWC Wage Orders.

**EIGHTEENTH CAUSE OF ACTION**

California Labor Code; Solicitation of Employee Through Misrepresentation

(Against the Velonza Defendants)

142.   Edelynne realleges and incorporates each of the foregoing paragraphs by reference.

143.   California Labor Code § 970 prohibits any person from influencing,

28

persuading, or engaging any person to change from one place to another in the state for the purpose of working in any branch of labor, by means of knowingly false representations, concerning the compensation to be paid for such work.

144.   California Labor Code § 972 provides a private right of action for victims of violations of § 970 and allows for double damages—including emotional damages—resulting from such misrepresentations.

145.   The Velonza Defendants influenced and persuaded Edelynne to relocate from the Philippines to Los Angeles by promising a well-paying job, help with Edelynne's daughters' college education, and a promise to "fix" Edelynne's immigration status so that she could obtain a green card in the United States. However, the Velonza Defendants did not provide Edelynne what they promised. On information and belief, the Velonza Defendants acted fraudulently and with malice in falsely promising Edelynne such compensation and then failing to ever pay it.

146.   As a direct and proximate result of these actions, Edelynne has sustained damages, including lost wages, mental suffering, humiliation, and emotional distress, entitling her to damages in an amount to be proven at trial equal to twice the amount of the actual damages due to such misrepresentations, plus punitive damages.

## NINETEENTH CAUSE OF ACTION

Intentional Infliction of Emotional Distress

(Against the Velonza Defendants)

147.   Edelynne realleges and incorporates each of the foregoing paragraphs by reference.

148.   The Velonza Defendants acted well beyond the bounds of normal human decency by threatening Edelynne on a regular basis with physical harm, legal harm, and deportation. They prevented and hindered Edelynne's ability to communicate with others and confined her to the home of Mr. and Mrs. Velonza. These acts isolated Edelynne from the local community and from her family in the Philippines. Further, the Velonza Defendants "lent" Edelynne out to other family members so that they too

1  could benefit from her labor.

2      149.   As a result of the Velonza Defendants' outrageous and extreme behavior,

3  Edelynne was put in fear of her safety and health, and suffered and continues to suffer

4  extreme emotional distress.

5      150.   The Velonza Defendants knowingly and intentionally acted with the goal

6  of causing Edelynne extreme emotional distress.

7      151.   Edelynne is entitled to compensatory and punitive damages in an amount

8  to be determined at trial.

9                    **TWENTIETH CAUSE OF ACTION**

10                 Negligent Infliction of Emotional Distress

11                    (Against the Velonza Defendants)

12      152.   Edelynne realleges and incorporates each of the foregoing paragraphs by

13  reference.

14      153.   The Velonza Defendants acted well beyond the bounds of normal human

15  decency by threatening Edelynne on a regular basis with physical harm, legal harm,

16  and deportation. They prevented and hindered Edelynne's ability to communicate

17  with others and confined her to the home of Mr. and Mrs. Velonza. These acts isolated

18  Edelynne from the local community and from her family in the Philippines. Further,

19  the Velonza Defendants "lent" Edelynne out to other family members so that they too

20  could benefit from her labor.

21      154.   As a result of the Velonza Defendants' threats, Edelynne was put in fear

22  of her safety and health and has suffered and continues to suffer extreme emotional

23  distress.

24      155.   The Velonza Defendants acted at least negligently in causing Edelynne's

25  extreme emotional distress.

26      156.   Edelynne is entitled to compensatory and punitive damages in an amount

27  to be determined at trial.

28

## TWENTY FIRST CAUSE OF ACTION

Negligence

(Against the Velonza Defendants)

157. Edelynne realleges and incorporates each of the foregoing paragraphs by reference.

158. The Velonza Defendants stood in a special relationship with Edelynne, based on the facts alleged in this Complaint, including but not limited to the following: they or their agents obtained documents for Edelynne to use to travel to the United States; they procured Edelynne's presence in the United States on fraudulent pretenses; they insisted Edelynne live in their home; they knew Edelynne spoke little English and had no familiarity with the customs, culture, society or laws of the United States; and, on information and belief, they knew at the time they brought Edelynne to the United States that she had no money for return airfare and no other means of earning money in the United States.

159. The California Labor Code imposes duties on employers, including the duty to "furnish employment and a place of employment that is safe and healthful for employees therein" and "[t]o do every other thing reasonably necessary to protect the life, safety, and health of employees." California Labor Code §§ 6400 and 6403.

160. By virtue of the relationship described above and the Velonza Defendants' position as Edelynne's employer, the Velonza Defendants' duty of reasonable care toward Edelynne under the circumstances included but was not limited to: (1) a duty to provide reasonable accommodations and a safe working and living environment; (2) a duty of reasonable care under the circumstances to protect Edelynne's emotional state; (3) a duty to allow Edelynne reasonable rest from her work, including those rest periods required by law; (4) a duty to not unnecessarily expose Edelynne to potential physical harm including, but not limited to, potential harm caused by requiring her to test cosmetic products on her own skin; (5) a duty not to provide Edelynne food that was known to be expired; (6) a duty to permit Edelynne

to access needed medical and dental care in a timely fashion; and (7) a duty to ensure Edelynne was informed of her rights as an employee under the laws of the United States and the State of California.

161.   On the basis of the facts alleged in this Complaint, the Velonza Defendants assumed a duty of care to Edelynne beyond that owed to the public in general, including but not limited to the duties listed above.

162.   The Velonza Defendants breached these duties owed to Edelynne by the acts and omissions alleged in this Complaint, including but not limited to subjecting Edelynne to threats and abuse, failing to provide Edelynne reasonable rest periods, and requiring Edelynne to test cosmetic products on her own skin, which resulted in significant pain and ongoing skin irritation.

163.   As a direct and proximate result of these actions, Edelynne has sustained damages and pain and suffering, including physical pain, emotional distress, embarrassment, and humiliation.

164.   Edelynne is entitled to damages in an amount to be determined at trial.

### TWENTY SECOND CAUSE OF ACTION

Negligence Per Se

(Against the Velonza Defendants)

165.   Edelynne realleges and incorporates each of the foregoing paragraphs by reference.

166.   The services provided by Edelynne to the Velonza Defendants were performed under conditions that violate various federal and state laws as referenced in the forgoing paragraphs. These include, but are not limited to, federal and state labor and anti-trafficking laws. Such laws were enacted to protect workers from economic and personal injuries caused by forced labor, poverty-level wages, unduly long working hours, discrimination, and other substandard working conditions. The acts and omissions of the Velonza Defendants, as alleged in this Complaint, were a substantial factor contributing to the illegal working conditions under which Edelynne

labored.

167.   As a person who was trafficked and forced to labor long hours for poverty-level wages, Edelynne is among the class of persons that the statutes and regulations referenced in the foregoing paragraphs were designed to protect. Further, Edelynne's injuries are of the type that the foregoing statutes and regulations are intended to prevent. The Velonza Defendants' violations of the foregoing statues and regulations, as alleged in this Complaint, constituted negligence per se, and created a presumption of negligence.

168.   As a direct and proximate cause of result of these actions, Edelynne has sustained damages, experienced pain and suffering, including physical pain, emotional distress, embarrassment, and humiliation.

169.   Edelynne is entitled to damages in an amount to be determined at trial.

### TWENTY THIRD CAUSE OF ACTION

### Personal Injury

### (Against the Velonza Defendants)

170.   Edelynne realleges and incorporates each of the foregoing paragraphs by reference.

171.   California Labor Code § 3706 permits employees who are injured during the course and scope of their employment to bring a civil claim against an employer who has failed to secure workers' compensation coverage as of the time of the injury.

172.   As a result of the Velonza Defendants' breach of their duty of care to Edelynne as described in the forgoing paragraphs, Edelynne was injured during the course and scope of her employment. This included, but was not limited to, significant pain and ongoing skin irritation as a result of the Velonza Defendants' demands that Edelynne test cosmetics on her own skin, illness due to consuming spoiled food provided by the Velonza Defendants, ongoing physical pain as a result of the Velonza Defendants' refusal to permit Edelynne to access medical and dental services, and severe emotional distress as a direct result of the Velonza Defendants' threats of arrest,

1  imprisonment, and deportation.

2      173.   As a direct and proximate cause of these actions, Edelynne has sustained

3  damages, experienced pain and suffering, including physical pain, emotional distress,

4  embarrassment, and humiliation.

5      174.   Edelynne is entitled to damages in an amount to be determined at trial.

6                          **TWENTY FOURTH CAUSE OF ACTION**

7                                      Unfair Competition

8                             (Against the Velonza Defendants)

9      175.   Edelynne realleges and incorporates each of the foregoing paragraphs by

10  reference.

11      176.   The California Unfair Competition Law, in Cal. Bus. & Prof. Code

12  § 17203, permits a court to provide restitution and injunctive relief to restore to

13  Edelynne any interest in money or property which may have been acquired by means

14  of unfair competition. Cal. Bus. & Prof. Code § 17200 defines "unfair competition"

15  to include any unlawful, unfair, or fraudulent, business act or practice. An individual

16  has standing to bring a claim under the UCL if he or she has suffered injury in fact,

17  and has lost money or property as a result of the unfair competition.

18      177.   The Velonza Defendants engaged in unlawful business acts or practices,

19  including those set forth in the preceding paragraphs of this Complaint. The Velonza

20  Defendants, in operating their business, engaged in systematic violations of state and

21  federal law including, but not limited to, minimum wage, overtime, and human

22  trafficking laws. These violations caused injury and the loss of money or property to

23  Edelynne.

24      178.   The Velonza Defendants' unlawful business practices also included

25  violations of California Labor Code § 970, which prohibits any person from

26  influencing, persuading, or engaging any person to change from any place outside

27  California to any place inside California for the purpose of working in any branch of

28  labor, by means of knowingly false representations, concerning the character of,

compensation for, or housing conditions related to such work.

179.   The Velonza Defendants made representations to Edelynne regarding her employment in the United States, which the Velonza Defendants knew to be false. They told Edelynne that she would work only as a caregiver, promised a certain level of pay, and omitted key details about the nature and conditions of her work, including those set forth in the preceding paragraphs of this Complaint.

180.   By means of such representations, the Velonza Defendants influenced, persuaded, and ultimately engaged Edelynne to leave her home and family in the Philippines and to relocate to Los Angeles.

181.   The Velonza Defendants' unlawful business practices also included violations of California Labor Code § 223, which prohibits an employer from secretly paying one wage, while purporting to pay a higher wage. On information and belief, the Velonza Defendants told Edelynne they were depositing her earned wages into an account for her benefit, but in fact did not do so and did not intend to do so.

182.   Edelynne is entitled to full restitution and other appropriate injunctive relief from the Velonza Defendants, as necessary and according to proof, to restore any and all monies withheld, acquired, and/or converted by the Velonza Defendants by means of the unfair practices complained of herein.

**TWENTY FIFTH CAUSE OF ACTION**

Conversion

(Against the Velonza Defendants)

183.   Edelynne realleges and incorporates each of the foregoing paragraphs by reference.

184.   The Velonza Defendants wrongfully took and assumed ownership over Edelynne's official passport without her authorization and to the exclusion of Edelynne's ownership rights in the property. Despite multiple requests for its return, the Velonza Defendants maintained ownership over Edelynne's passport from approximately April 6, 2014 to January 12, 2017.

185.   The Velonza Defendants have also wrongfully assumed ownership over clothes and other personal items belonging to Edelynne. Edelynne is informed and believes, and on that basis alleges, that these items remain in the Velonzas' possession today.

186.   As a result, Edelynne is entitled to return of the property and to compensatory and punitive damages in an amount to be determined at trial.

## TWENTY SIXTH CAUSE OF ACTION

### False Imprisonment

### (Against the Velonza Defendants and Mr. Orqueza)

187.   Edelynne realleges and incorporates each of the foregoing paragraphs by reference.

188.   The Velonza Defendants and Mr. Orqueza knowingly and intentionally confined Edelynne within the Velonza Defendants' home by threatening arrest and deportation and hindered or prevented her ability to leave the home or travel unaccompanied, so as to deprive Edelynne of her freedom of movement.

189.   When the Velonzas were not home, they were able to continue monitoring Edelynne by use of a CCTV monitoring system in the Velonzas' apartments. The system allowed the Velonzas to monitor Edelynne from their cell phones and speak to Edelynne through the CCTV system. Such surveillance further restricted Edelynne's ability to leave the Velonza apartments.

190.   In October 2016, Mr. Orqueza prevented Edelynne from leaving the Velonza Defendants' property by physically placing himself between Edelynne and the property gate. Mr. Orqueza also used intimidation and psychological manipulation to prevent Edelynne from leaving.

191.   Edelynne was conscious of being confined and did not consent to her confinement.

192.   The Velonza Defendants and Mr. Orqueza confined Edelynne knowingly and willfully with malice and disregard for her rights.

FIRST AMENDED COMPLAINT

193.   As a proximate result of Mr. Orqueza and the Velonza Defendants' conduct, Edelynne experienced pain and suffering, including emotional distress, embarrassment, and humiliation.

194.   Edelynne is entitled to compensatory and punitive damages in an amount to be determined at trial.

## TWENTY SEVENTH CAUSE OF ACTION

### Quantum Meruit

### (Against the Velonza Defendants)

195.   Edelynne realleges and incorporates each of the foregoing paragraphs by reference.

196.   Through her services, Edelynne conferred a significant benefit on the Velonza Defendants.

197.   The Velonza Defendants accepted this benefit, and Edelynne expected to be fairly and equitably compensated for her services in good faith.

198.   The Velonza Defendants have failed to provide Edelynne with appropriate payment for this conferred benefit, the value of which is calculable.

199.   The Velonza Defendants are liable under quantum meruit for the services that Edelynne provided.

200.   Edelynne has suffered harm as a result of the Velonza Defendants' failure to provide her with adequate compensation, for which she is entitled to recover the reasonable value of the services she performed for the Velonza Defendants.

## **JURY DEMAND**

Edelynne respectfully demands a trial by jury on all claims and causes of action properly tried thereto.

## **PRAYER**

WHEREFORE, Edelynne prays that this Court:

1.     Enter judgment in favor of Edelynne as to every cause of action asserted in the Complaint;

FIRST AMENDED COMPLAINT

2.    Award Edelynne such damages as may be appropriate, including compensatory, exemplary, punitive, and liquidated damages;

3.    Award Edelynne statutory damages, penalties, double damages, treble damages, special damages, and all other forms of monetary relief recoverable under applicable law;

4.    Award Edelynne appropriate restitution;

5.    Award Edelynne her attorneys' fees and costs;

6.    Award Edelynne pre- and post-judgement interest;

7.    Award preliminary and permanent injunctive relief;

8.    Enter an order to prohibit the avoidance of transfers or obligations and to attach any assets or proceeds; and

9.    Award Edelynne any such other and further relief as the Court deems just and proper.

DATED: March 23, 2018            JENNER & BLOCK LLP


                                 /s/ Amy M. Gallegos
                                 Amy Gallegos

                                 Attorneys for Plaintiff
                                 Edelynne Bergado

FIRST AMENDED COMPLAINT